FILED

2012 Sep-30  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MADISON OSLIN, INC. and** | ) | |
| **MADISON OSLIN RESEARCH, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:11-cv-01343-SLB** |
| | ) | |
| **INTERSTATE RESOURCES, INC.;** *et* | ) | |
| *al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is currently before the court on defendants Interstate Resources, Inc.,

Interstate Corrpack, LLC, James Morgan, and John Cristos's Partial Motion to Dismiss

and for A More Definite Statement, (doc. 9),[1] and Motion for Severance and to Transfer

Venue, (doc. 11).  Upon consideration of the record, the submissions of the parties, the

arguments of counsel, and the relevant law, the court is of the opinion that defendants'

Partial Motion to Dismiss is due to be granted in part and denied in part, defendants'

Motion for Severance is due to be denied as moot, and defendants' Motion to Transfer

Venue is due to be granted.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## FACTS AND PROCEDURAL HISTORY[2]

Plaintiffs, Madison Oslin, Inc. ("Madison Oslin") and Madison Oslin Research, Inc. ("Madison Oslin Research") (collectively "plaintiffs") are Alabama corporations with a principal place of business in Jefferson County, Alabama. (Doc. 1-1 ¶ 1-2.) Plaintiffs allege that defendants, Interstate Resources, Inc. ("Interstate"), Interstate Corrpack, LLC ("Corrpack")[3], James Morgan ("Morgan"), and John Cristos ("Cristos") (collectively the "defendants") participated in the wrongful use and/or disclosure of plaintiffs' novel ideas, trade secrets, and/or other confidential information. (*Id.* ¶ 3.) Defendant Interstate is a Virginia corporation with its principal place of business in Arlington, Virginia. (*Id.* ¶ 4.) Defendant Corrpack is a Maryland corporation with its principal place of business in Cambridge, Maryland. (*Id.* ¶ 5.) Defendants Morgan and Cristos are resident citizens of South Carolina and North Carolina, respectively. (Doc. 12 at 3-4.) Plaintiffs contend that at all times relevant to this case, defendants were agents, employees, and/or representatives of each other, acting within the scope of such agency with the consent, permission, authorization, and knowledge of each other. (Doc. 1-1 ¶ 15.) Former defendants American Inks and Coating Company, Inc., Progressive Coatings, Inc.,

---

[2]While this section addresses the facts and procedural history relevant to both of the pending Motions addressed herein, for purposes of ruling on the Partial Motion to Dismiss, the court only considers those facts drawn from the pleadings. *See* FED. R. CIV. P. 12(b)(6) advisory committee note. The facts as stated herein may not be the true facts as they are drawn from the pleadings.

[3]Defendants note that Corrpack was misnamed in the Complaint as Interstate Container. (Doc. 9 at 1.)

Mosely Holdings, Inc., and Jerry L. Mosely have been dismissed from this lawsuit without prejudice.  (Doc. 16.)

Plaintiff, Madison Oslin, is a paper coating company that developed an original idea of using a polyester coating to create a recyclable corrugated box.  (Doc. 1-1 ¶ 17.) Plaintiff Madison Olsin Research "holds a process and apparatus patent for applying polyester coating to rolls of paper board to create [such a] box."  (*Id.*)  "In 1998, Plaintiffs developed a method for using polyester coating in corrugated boxes as an alternative to wax coated boxes."  (*Id.*)  Since wax coated boxes are not recyclable, plaintiffs developed this coating and process "to supply coated paperboard to box manufacturers who would in turn manufacture recyclable corrugated box[es] for the produce and poultry industries," among others.  (*Id.*)  Customarily, industries use wax coated corrugated boxes for produce and poultry shipments.  (*Id.*)  Since wax coated boxes are not recyclable, their use creates substantial landfill costs.  (*Id.*)  However, since plaintiffs' polyester coated paperboard created recyclable boxes, these boxes "were equal to or less than the cost of wax coated boxes before including any reductions in landfill costs and recycle value."  (*Id.*)  Before plaintiffs developed this technology, other companies unsuccessfully attempted to design recyclable corrugated boxes.  (*Id.* ¶ 18.)

Plaintiffs believed their process was proprietary, and thus claim they kept specific information about the technology and its application confidential.  (*Id.* ¶ 19.)  Prior to plaintiffs creating this process, the use of polyester coating was not industry custom.  (*Id.*)

3

Plaintiffs contend that defendants did not use polyester coatings before obtaining plaintiffs' confidential information.  (*Id.*)

Defendant Interstate is a manufacturing company that "operates two paper mills, a timber and lumber operation, three corrugated container operations, three corrugated sheet plants, and one corrugated sheet feeder."  (*Id.* ¶ 20.)  Defendant Corrpack, a division of Interstate, is "a manufacturer of paper containers (including corrugated containers)."  (*Id.*)  Defendant Morgan is President and COO of Interstate, and Defendant Cristos is an employee or agent of Interstate.  (*Id.* ¶ 21.)

When Interstate was interested in producing a recyclable corrugated box, plaintiffs' supplier of coating materials encouraged Interstate and Morgan to contact plaintiffs.  (*Id.*)  As a result, in October 2007, Interstate and Morgan met with plaintiffs in Birmingham, Alabama, and proposed a joint venture agreement.  (*Id.*)  In consideration of entering the joint venture, Interstate offered to pay plaintiffs $6 million, and split evenly with plaintiffs all profits from the recyclable corrugated boxes.  (*Id.*)

Later, "[p]laintiffs and Interstate scheduled 'trials' to examine [plaintiffs'] capabilities."  (*Id.* ¶ 22.)  In March-May 2008, plaintiffs successfully conducted trials at Mountaire Farms in Delaware.  (*Id.*)  Then, Morgan requested to observe plaintiffs' coating process at plaintiffs' Irondale, Alabama facility.  (*Id.*)  Next, Interstate and Morgan informed plaintiffs that "Interstate wanted [Mosely, Interstate's coating expert,] and an Interstate employee to examine and learn more about Plaintiffs' coating technology."  (*Id.*)  Plaintiffs believed that Interstate's desire to understand the coating

4

technology "was an integral and required component of the joint venture agreement." (*Id.* ¶ 23.)  While plaintiffs understood that it would need to share its confidential information with Interstate, plaintiffs believed it was reasonably necessary to share this information with defendants as joint venture partners.  (*Id.* ¶ 24.)  Accordingly, on the condition that defendants sign a confidentiality agreement, plaintiffs permitted Interstate to visit plaintiffs' facility to observe its coating process. (*Id.* ¶ 25.)

In March 2008, plaintiffs sent defendant Cristos a confidentiality agreement, which was executed on March 7th.  (*Id.* ¶ 26.)  On March 7, 2008, Cristos observed plaintiffs' coating process at its facility. (*Id.* ¶ 27.)  Prior to Cristos's observation, plaintiffs' employee, Major Ogilvie, informed Cristos that all information obtained from the visit was confidential and proprietary.  (*Id.*)  Cristos "agreed to protect the confidentiality of Plaintiffs' information."  (*Id.*)

While touring plaintiffs' facility, "[d]efendants were provided with specific, detailed information regarding the coating process, the correct temperatures required, the exact mixtures required and materials used and the exact manner in which each step of the process was to be carried out."  (*Id.* ¶ 29.)  Cristos took notes as he observed the mixing of the coating materials as well as the process on the coating machine.  (*Id.*)

In March and May, 2008, plaintiffs traveled to Corrpack's Cambridge, Maryland facility for trials using plaintiffs' coatings with Interstate's boxes.  (*Id.* ¶ 30.)  Initially, defendants' results were unsuccessful.  (*Id.*)  Plaintiffs contend, however, that once defendants followed its  instructions, the trials succeeded.  (*Id.*)  During this time, Morgan

5

verbally affirmed that per the joint venture agreement, Interstate would pay a lump sum of $6 million.  (*Id.* ¶ 31.)

On March 20, 2009, plaintiffs, Interstate, and Morgan met with BGR Group in Washington D.C.  (*Id.* ¶ 33.)  Plaintiffs and Interstate split BGR's consultation fee.  (*Id.*) Plaintiffs and Interstate wanted BGR's assistance in obtaining equity funding and investigating available grants for plaintiffs' environmentally friendly technology.  (*Id.*) Plaintiffs allege they first learned that Interstate performed plaintiffs coating on its own at the BGR meeting.  (*Id.*)  Morgan informed plaintiffs that Interstate successfully performed non-wax coating on corrugated boxes, known as "MAP boxes," yet Interstate could not perform the coating on "icepack boxes."  (*Id.*)

In June 2009, plaintiffs, Interstate, and Morgan returned to BGR.  (*Id.* ¶ 34.)  At this time, Morgan notified plaintiffs that Interstate improved the quality of its coating. (*Id.*)  As a result, Interstate no longer desired plaintiffs' assistance for "icepack boxes." (*Id.*)  Morgan suggested plaintiffs create a "compostable box."  (*Id.*)  Accordingly, on September 30, 2009, plaintiffs, Morgan, and Interstate employee, Jim Krahn, went to Seattle to observe Starbucks' efforts on compostable boxes.  (*Id.* ¶ 35.)  On October 2, 2009, Krahn told plaintiffs, "Thank you for teaching us how to mix, apply, and corrugate the coating. If you hadn't taught us about the cross-linking, we would have never figured it out."  (*Id.*)  On November 11, 2010, Krahn reiterated this statement at plaintiffs' Birmingham facility.  (*Id.*)

In January 2011, Interstate advertised that it created a recyclable corrugated poultry box at the 2011 Poultry Expo in Atlanta, Georgia.  (*Id.* ¶ 36.)  Interstate also touted its recyclable corrugated boxes via its website and other publications.  (*Id.*)  Interstate's ads claim that it "did the impossible. . .that is [created] a patent-pending wax replacement that is effective, sustainable, 100% recyclable and cost effective."  (*Id.*)

Plaintiffs' Complaint asserts against defendants claims for conversion, unjust enrichment, misappropriation of trade secrets under the Alabama Trade Secrets Act, breach of fiduciary duty, breach of contract, breach of implied duty of good faith and fair dealing, misrepresentation, suppression, and breach of implied contract.  (*See* Doc. 1-1.)  The complaint also included claims for fraudulent concealment, tortious interference with a business relationship, and injunctive relief.  (*See id.* ¶¶ 41-43; 76-77; 83-84.)  These claims were voluntarily dismissed without prejudice.  (Doc. 24.)

## LEGAL STANDARD: MOTION TO DISMISS

A defendant may move to dismiss a complaint pursuant to FED. R. CIV. P. 12(b)(6) if the plaintiff has failed to state a claim upon which relief may be granted.  To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint "does not need detailed factual allegations;" however, the "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (internal citations omitted).[4]  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

The plaintiff must plead "enough facts to state a claim that is plausible on its face." *Id.* at

570.

"When considering a motion to dismiss, all facts set forth in plaintiff's complaint

'are to be accepted as true and the court limits its consideration to the pleadings and

exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th

Cir. 2000) (per curiam) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir.

1993)).  All "reasonable inferences" are drawn in favor of the plaintiff.  *St. George v.

Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).  "[U]nsupported conclusions of law

or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6)

dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (quoting *Marsh v.

Butler Cnty., Ala.*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001)). Furthermore, "[a]

complaint may not be dismissed because the plaintiff's claims do not support the legal

---

[4]In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court abrogated the oft-cited standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," which was set forth in *Conley v. Gibson*. *Twombly,* 550 U.S. at 561 (quoting 355 U.S. 41, 45-46 (1957)).  The Supreme Court stated that the "no set of facts" standard "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563.  The "decision in *Twombly* expounded the pleading standard for all civil actions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009) (internal quotation marks and citations omitted).

theory he relies upon since the court must determine if the allegations provide for relief

on *any* possible theory." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364,

1369 (11th Cir. 1997).

## DISCUSSION

**I.     Dismissal of Certain Claims Pursuant to FED. R. CIV. P. 12(b)(6)**

**A.     The Alabama Trade Secrets Act and its Application to Tort Claims Based on Misappropriation of Trade Secrets**

Defendants move to dismiss plaintiffs' claims for conversion, unjust enrichment,

breach of fiduciary duty, misrepresentation, and suppression claiming that these common

law tort causes of action are all based on the same underlying allegations of defendants'

misappropriation of confidential information, and therefore, they are subsumed or

preempted by the Alabama Trade Secrets Act ("ATSA" or "the Act").  (Doc. 9 at 2-4.)[5]

The court agrees.

Before the court addresses the preemptive effect of the ATSA on plaintiffs'

claims, it is helpful to discuss the purpose of the statute, and more specifically, the extent

to which it precludes common law causes of action for misappropriation of trade secrets.

**1.     Ala. Code 8-27-1 *et seq.*: The Alabama Trade Secrets Act**

The ATSA protects a trade secret from disclosure or unauthorized use by another,

and a person is liable for misappropriation if:

---

[5] Defendants' Motion to Dismiss also requests under the same theory, that the court dismiss plaintiffs' claims for fraudulent concealment and tortious interference with a business relationship; (doc. 9 at 2-4), however, those claims were later dismissed voluntarily.  (Doc. 24.)

> (1) That person discovered the trade secret by improper means;
> (2) That person's disclosure or use constitutes a breach of
> confidence reposed in that person by the other; (3) That person
> learned the trade secret from a third person, and knew or should
> have known that (i) the information was a trade secret and (ii)
> that the trade secret had been appropriated under circumstances
> which violate the provisions of (1) or (2), above; or (4) That
> person learned the information and knew or should have known
> that it was a trade secret and that its disclosure was made to that
> person by mistake.

ALA. CODE § 8-27-3 (1975).  For clarification, the Act defines what constitutes a "trade

secret," "improper means," as well as who qualifies as a "person."  *Id.* § 8-27-2.  Relief

provided under the ATSA includes injunctive and equitable remedies, including lost

profits, actual damages, and exemplary damages.  *Id.* § 8-27-4(a).  The Act further awards

reasonable attorney's fees to the prevailing party, and it also imposes criminal liability.

*Id.* § (a)(3), (b).

    While the above provisions are relatively unambiguous, the section regarding the

ATSA's effect on other law does not define the extent to which the Act abrogates

common law causes of action for misappropriation of confidential information: "Those

provisions of this chapter that are inconsistent with the common law of trade secrets

supersede the common law; otherwise, this chapter should be construed to be consistent

with the common law of trade secrets."  *Id.* § 8-27-6.  The comment to this section makes

clear, that to some extent, the ATSA was intended to replace  common law causes of

action for misappropriation of trade secrets:

> The act is intended both to codify and to modify the
> common  law  of  trade  secrets  in  Alabama.  Where  the  act

codifies, pre-existing sources may shed light on the meaning of the statute. There is no intention, however, to supersede other areas of the law.

The act draws primarily on the common law of trade secrets as it is reflected in the first Restatement of Torts (1939). Where contemporary problems or other policy considerations make deviations from the Restatement advisable, the act draws first from the Uniform Trade Secrets Act and the case law that has developed since the Restatement; however, where necessary the Alabama Act differs from these sources (e.g., the length of the statute of limitations and the decision not to use the term "espionage" in the definition of the term "improper means").

*Id.* Comment, § 8-27-6.  The question now before the court is how broad is the reach of Section 8-27-6 in superseding common law actions related to trade secrets?  This inquiry, however, is guided, in part, by the applicable standard of law on a motion to dismiss, and therefore, is limited to determining which of plaintiffs' common law claims, as a matter of law, may be plead alongside a misappropriation claim under the ATSA.  *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009) ("At the pleading stage, we assess only whether [the] allegations are 'enough to raise a right to relief above the speculative level.'" (quoting *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th. Cir. 2008))).

## 2.    Determining the Preemptive Scope of ATSA Section 8-27-6

There is little case law addressing the ATSA's preemptive effect on common law misappropriation claims.  In *Allied Supply Co. v. Brown*, the only Alabama Supreme Court case specifically discussing Section 8-27-6 and the comment thereto, the court reversed denial of summary judgment on the plaintiff's claim for breach of fiduciary duty,

which was based, in part, on specific allegations that the defendants misappropriated confidential documents.  585 So. 2d 33, 36-37 (Ala. 1991).  Relying on the comment to Section 8-27-6, the court reasoned that "[b]ecause existing common law tort theories of recovery have been replaced by provisions of the Act, the [trial] court's holding that [plaintiff] could pursue a common law misappropriation cause of action [within a claim of breach of fiduciary duty] was error and . . . due to be reversed."  *Id.* at 37; *see also Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, 690 F. Supp. 2d 1267, 1276-77 (N.D. Ala. 2010) (granting summary judgment for defendants against one of plaintiff's claims, citing to the decision in *Allied Supply*, and holding that plaintiff "may not pursue its breach-of-fiduciary claim under a theory that is essentially the same as its ATSA claim"). The *Allied Supply* court's interpretation of the broad, open-ended language of Section 8-27-6 and the accompanying comment implies that the ATSA preempts not only common law claims specifically alleging the misappropriation of trade secrets but also other causes of action based on the *same* underlying facts giving rise to a claim under the ATSA.  *See* 585 So. 2d at 36-37.  However, there is no clear standard in Alabama articulating exactly how similar the alleged facts giving rise to a claim for misappropriation of trade secrets and other common law claims must be to trigger preemption under Section 8-27-6.  Thus, the court turns to the comments to the ATSA as well as case law construing other state laws modeled after a provision of the Uniform Trade Secrets Act ("UTSA" or the "Uniform Act") on which the ATSA is partially based.

Given the broad and ambiguous language in Section 8-27-6, the comments[6] to the ATSA provide some guidance as to the intent of the legislature regarding the statute's effect on common law claims for misappropriation and claims founded on similar facts. The standard of statutory construction and interpretation in Alabama is well-settled:

> The fundamental rule of statutory construction is that [the] Court is to ascertain and effectuate the legislative intent as expressed in the statute.   In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses.   In construing statutes, we may glean legislative intent from the language used, the reason and necessity for the legislative act, and the purpose sought to be obtained. Courts do not interpret statutory provisions in isolation, but consider them in the context of the entire statutory scheme.

*Long v. Bryant*,  992 So. 2d 673, 684 (Ala. 2008) (internal quotation marks and citations omitted).

The ATSA states specific criteria defining what qualifies as a trade secret and what constitutes improper means regarding the misappropriation of a trade secret.  ALA. CODE § 8-27-2.  The comments to Section 8-27-2 provide that contrary to the broader common law elements of a trade secret and those provided under the UTSA, the ATSA sets forth a

---

[6] Plaintiffs urge the court to disregard the comments to the ATSA as they "'have not been enacted by the legislature and do not necessarily represent legislative intent.'" (Doc. 17 at 18 [quoting *IMED Corp. v. Sys. Eng'g Assocs. Corp.*, 602 So. 2d 344, 348 (Ala. 1992).].)  However, if the language of 8-27-6 was clear and unambiguous, there would be no need to consult the comments to ascertain its preemptive reach.  "'If the statutory language is ambiguous, . . . courts may examine extrinsic materials . . . .'"  *Pinigis v. Regions Bank*, 977 So. 2d 446, 451 (Ala. 2007) (quoting *Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000)).

narrower definition, which must be satisfied to receive protection under the Act.  For example:

> The definition states that a trade secret is information. The type of information covered by trade secret law is limited in the following ways:
>
> . . . .
>
> (2) The burden is on the one asserting the trade secret to show that it is included or embodied in at least one of the categories listed in paragraph b. The trade secret is not the object, process, etc., in which a trade secret is embodied, but is specific information. The categories listed should be construed broadly to encourage the development of ideas. This is more restrictive than the approach taken by the Restatement or the approach taken by the Uniform Act.

*Id.* § Comment (a)(2).  By contrast, Section 8-27-6 contains broad language with very little guidance as to its effect on common law claims of misappropriation.  However, as the language of the statute and comments to the Act make clear, the UTSA served as a model for and influenced the drafting of the ATSA.  *Id.* §§ 8-27-2 Comment; 8-27-6 Comment.  Section 7 of the UTSA "displaces conflicting tort, restitutionary, and other law . . . providing civil remedies for misappropriation of a trade secret."  UNIF. TRADE SECRETS ACT § 7(a) (1985).  In addition to contract and criminal remedies, that section excludes from preemption "other civil remedies that are not based upon misappropriation of a trade secret."  *Id.* § (b).  Compared to the language of ATSA Section 8-27-6, UTSA Section 7 clarifies that only those causes of action "providing civil remedies for misappropriation" are superceded.  *Id.* § (a).

14

Courts in states adopting the Uniform Act have struggled to establish which common law torts fit within its preemptive scope. *See generally* HENRY H. PERRITT, JR., PRACTISING LAW INST., TRADE SECRETS: A PRACTITIONER'S GUIDE § 1:5.4, *available at* Westlaw PLIREF-TRDSEC s 1:5.4 (discussing the differing approaches taken by state and federal courts in applying  states' codified versions of Section 7 of the UTSA).  For guidance, the court turns to Eleventh Circuit case law construing Georgia's codified version of the UTSA.  In *Penalty Kick Mgmt., Ltd. v. Coca Cola Co.*, the Eleventh Circuit affirmed summary judgment in favor of defendants finding all of plaintiff's common law claims arising out of the alleged misappropriation of its trade secrets were preempted by the Georgia Trade Secrets Act.  318 F.3d 1284, 1286 (11th Cir. 2003).  The Georgia Trade Secrets Act ("GTSA" or "Georgia Act") contains a preemption provision nearly identical to Section 7 of the UTSA.  *See* GA. CODE ANN. § 10-1-767(a) ("this article shall supersede conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.").  The plaintiff in *Penalty Kick* argued that its claims for conversion, breach of confidential relationship, unjust enrichment, and quantum meruit were "each distinct theories  of civil remedies for the wrongful use of information not rising to the level of a trade secret" and thus not preempted by the Georgia Act.  318 F.3d at 1297.  Notwithstanding the plaintiff's insistence that each claim was a separate cause of action, the court found that they were all based on the same allegations that constituted misappropriation under the Georgia Act: "even if [the plaintiff] is correct that information outside the scope of a trade secret is not preempted

under Georgia law, [its] four claims at issue are clearly 'based' upon a trade secret, and thus are superceded by the GTSA." *Id.* at 1297-98 (citation omitted).

Although the decision in *Penalty Kick* was based, in part, on the court's review of summary judgment and ultimate determination that the plaintiff's underlying allegations actually constituted a claim for misappropriation under the Georgia Act, the court's reasoning has been extended to claims that may not decisively state a cause under the GTSA but are nonetheless preempted because they rely on the same set of facts alleging misappropriation. *See Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1343-46 (N.D. Ga. 2007). In *Davidson*, the court granted summary judgment against plaintiff's common law claims for conversion, unjust enrichment, breach of fiduciary duty, and tortious interference, holding they were all "clearly 'based' upon a trade secret . . . [and] thus superseded by the GTSA." 540 F. Supp. 2d at 1347 (citing *Penalty Kick*, 318 F.3d at 1298). Much like the issues argued in this case, and with little guiding precedent, the parties in *Davidson* argued conflicting interpretations of the GTSA. *Id.* at 1344. The plaintiff contended that the statute allowed for pleading of alternative common law claims and that preemption only applied after the finder of fact determined that those claims actually constitute a trade secret under the GTSA. *Id.* (citation omitted). Defendants countered with a broader view of the statute and argued that an explicit trade secret claim precluded plaintiff from pleading alternative theories based on the same allegations purportedly constituting misappropriation. *Id.* (citation omitted). Notably, the *Davidson* court relied on the decision in *Penalty Kick*, even though the Eleventh

Circuit did not address whether claims not necessarily involving trade secrets were preempted: "the [*Penalty Kick*] court explicitly declined to address the situation presented here–where certain information does *not* rise to the level of a trade secret." *Id.* at 1345. The *Davidson* court highlighted a case cited favorably in *Penalty Kick*, which held that under a different state's version of the UTSA (similar to the GTSA), common law claims reciting the same operative facts as a claim for misappropriation were preempted even if the common law claims did not explicitly concern trade secrets. *Id.* (citing *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1474-75 (D. Colo. 1996)).  Based on the *Marks* case and the underlying purpose of the GTSA, the *Davidson* court reasoned that the statute's requirements for proving confidential information qualifies as a trade secret before the GTSA applies, coupled with its preemption provision, reflects the legislative intent to bar alternative pleading that could circumvent the free exchange of information:

> [T]he rule of supersession is guided by the purpose of the constraints imposed by the GTSA–constraints which require the plaintiff to demonstrate economic value in claimed proprietary information and reasonable efforts to preserve its secrecy in order to recover for an asserted misappropriation of that information. If a plaintiff could alternatively recover for misappropriation of non-proprietary information or misappropriation of unguarded proprietary information, the legislative judgment contained in the GTSA-that such information should otherwise flow freely in the public domain-would be subverted. And it would make little sense to go through the rigamarole of proving information was truly a trade secret if a plaintiff could alternatively plead claims with less burdensome requirements of proof.

*Id.* at 1345.  The court thus held all of the plaintiff's common law claims barred as they sought to recover "for precisely the same conduct and resulting injury as [plaintiff] alleged was caused by the misappropriation of its trade secrets: the taking of supposedly proprietary information."  *Id.* at 1346.

### B.      Applying Section 8-27-6 to Plaintiffs' Common Law Claims

The court agrees with the holding in *Davidson* and finds the reasoning in that case compelling.  The ATSA "draws" from the UTSA, which is reflected by the fact that both statutes contain preemption provisions barring common law trade secret claims.  ALA. CODE, Comment § 8-27-6 (1975).  The wording of Section 8-27-6 suggests that the Alabama legislature intended an even greater preemptive scope than permitted in the UTSA where claims made under the ATSA "are inconsistent with the common law of trade secrets."  *Id.* § 8-27-6.  The common law of trade secrets permitted the allegedly wronged party to plead multiple remedies.  *See* Restatement (First) of Torts § 757 cmt. e (1939).  Section 8-27-6 indeed is inconsistent with common law as it "is intended both to codify *and to modify* the common law of trade secrets in Alabama" as reflected in the first Restatement of Torts, including the preemption of inconsistent common law trade secret claims.  *Id.* Comment.  To the extent plaintiffs plead common law causes of action based on the same underlying facts as those giving rise to their claim under the ATSA, (doc. 1-1 ¶¶ 48-52), such causes of action are preempted.  Like the plaintiffs in *Davidson* and *Allied Supply*, the facts supporting each cause of action originate from the same allegations, specifically that the "named Defendants . . . participated in the wrongful use

18

and/or disclosure of the novel ideas, trade secrets and/or other confidential information of the Plaintiff." (Doc. 1-1 ¶ 3.) The court "do[es] not agree . . . that [plaintiffs] c[an] pursue both statutory and common law theories of recovery for the defendants' alleged misappropriation of 'trade secrets.'" *Allied Supply*, 585 So. 2d at 37.

### 1. Conversion

Plaintiffs' claim under the ATSA (the fourth cause of action in the Complaint) declares plaintiffs' "novel idea" constituted a trade secret per the ATSA, and that the defendants "are liable for misappropriation or theft" of said trade secret due to defendants' "disclosure and/or use" of it. (Doc. 1-1 ¶¶ 50-51.) Plaintiffs' cause of action for conversion is based on defendants' alleged wrongful use and benefit of plaintiffs' "novel idea, trade secrets and/or other confidential information." (*Id.* ¶ 38.) Plaintiffs' common law conversion claim is preempted because "the factual basis for this claim is essentially the same as the one for the ATSA claim." *Bell Aerospace*, 690 F. Supp. 2d at 1276.

### 2. Unjust Enrichment

Plaintiffs' cause of action for unjust enrichment fails for the same reason. The allegations setting forth this claim assert no independent conduct or injury except that defendants "have been unjustly enriched at the expense of Plaintiffs as a result" of the misappropriation. (Doc. 1-1 ¶ 45.) This cause of action is therefore preempted as the underlying facts are "essentially the same" as those pled for relief under the ATSA. *Bell Aerospace*, 690 F. Supp. 2d at 1276.

### 3.      Breach of Fiduciary Duty

Plaintiffs' cause of action for breach of fiduciary duty likewise fails to add any

substantive allegations beyond the root offense of misappropriating plaintiffs' novel idea

or trade secret.  The complaint merely states:

> Defendants . . . breached their fiduciary duty to Plaintiffs in
> filing for a patent(s) on Plaintiffs' novel idea, trade secrets
> and/or other confidential information, in failing to disclose to
> Plaintiffs their actions in doing so, in failing to include
> Plaintiffs on said application(s), in manufacturing and selling
> recyclable corrugated boxes using Plaintiffs' novel idea, trade
> secrets and/or other confidential information and in consulting
> or advising other corrugated box manufacturers about
> Plaintiffs' novel idea, trade secrets and/or other confidential
> information.

(Doc. 1-1 ¶ 54.)  Plaintiffs' common law breach of fiduciary duty claim is preempted

because it essentially alleges the same factual bases as those set forth in its claim under

the ATSA.  *See Allied Supply*, 585 So. 2d at 36-37.

### 4.      Misrepresentation

Plaintiffs' cause of action for misrepresentation also fails for the same reason.  The

factual allegations underlying this claim repeat the same theory plaintiffs use in support of

their ATSA claim: "The purpose of Defendants' misrepresentations was to persuade

Plaintiffs to share their novel idea, trade secrets and/or confidential information with

Defendants."  (Doc. 1-1 ¶ 68.)  This cause of action is therefore preempted as the

underlying facts are "essentially the same" as those pled for relief under the ATSA.  *Bell*

*Aerospace*, 690 F. Supp. 2d at 1276.

20

### 5.     Suppression

Finally, plaintiffs' cause of action for suppression fails as it is also based on the same factual allegations underlying their ATSA claim.  The complaint merely states that "[t]he purpose of Defendants' suppression was to persuade Plaintiffs to share their novel idea, trade secrets and/or confidential information with Defendants" and that such conduct was done "intentionally" resulting in disclosure of the protected information. (Doc. 1-1 ¶¶ 73-74.)  This cause of action is therefore preempted as the underlying facts are "essentially the same" as those pled for relief under the ATSA.  *Bell Aerospace*, 690 F. Supp. 2d at 1276.

## II.    <u>Motion to Dismiss Certain Claims Based on Plaintiffs' Patent Applications</u>

Defendants' Partial Motion to Dismiss seeks dismissal of plaintiffs' claims of fraudulent suppression, breach of fiduciary duty, tortious interference with a business relationship, and injunctive relief because those claims appear to accuse all defendants of wrongfully filing patent applications when the Complaint expressly identifies only Interstate as the party who filed the applications. (Doc. 9.)  With respect to claims of fraudulent suppression, tortious interference with a business relationship, and injunctive relief defendants' Motion will be denied as moot because those claims were voluntarily dismissed by plaintiffs.  (Doc. 20; doc. 24.)  Defendants' Motion will also be denied as moot regarding plaintiffs' claim of breach of fiduciary duty as to patent infringement given the court's discussion *supra* finding that claim preempted under Section 8-27-6 of the ATSA.

21

### III.   Motion to Dismiss Certain Contract Claims

#### A.   Sixth Cause of Action: Breach of Express Contract

Plaintiffs' sixth cause of action for breach of contract, (doc. 1-1 ¶¶ 57-59), fails to state a claim against defendants, Morgan, Cristos, or Corrpack.  As the defendants correctly point out, "[i]t is not clear that Plaintiffs make an express contract claim against Defendants Morgan, Cristos, or Corrpack."  (Doc. 10 at 24.)  The unnumbered paragraph at the bottom of count six of the complaint, "pray[s] for a judgment against *Defendants, and each of them*" for damages and lost profits.  (Doc. 1-1 at 17 (emphasis added).)  Nowhere in the Complaint, however, is it alleged that Morgan, Cristos, or Corrpack were parties to an express contract with plaintiffs; therefore, plaintiffs cannot maintain an action against them for breach of contract.  "'It is hornbook contract law that someone who is not a party to a contract cannot be bound by the contract.'" *Ex parte Dickinson*, 711 So. 2d 984, 989 (Ala. 1998) (quoting *Lakeshore Drive Recreation Club, Inc. v. U.S. Fid. & Guar. Co.*, 398 So. 2d 278, 284 (Ala. 1981) (Torbert, C.J., dissenting)).

For this reason, plaintiffs' sixth cause of action will be dismissed as to defendants Morgan, Cristos, and Corrpack.

#### B.   Eleventh Cause of Action: Breach of Implied Contract

##### 1.   Contract Claims Against Morgan and Cristos

Plaintiffs' eleventh cause of action alleges that all defendants breached an implied contract.  (Doc. 1-1 ¶¶ 79-81.)  According to the Complaint, by "obtaining" plaintiffs' confidential information, "Defendants did impliedly agree to pay Plaintiffs compensation

22

for any use or employment of said novel idea, trade secret or other confidential information." (Doc. 1-1 ¶ 79.) The Supreme Court of Alabama has held that, "a complaint grounded in implied contract must state facts and circumstances-the acts and conduct of the parties from which the contract alleged can be inferred." *Berry v. Druid City Hosp. Bd.*, 333 So. 2d 796, 801 (Ala. 1976). "The difference between an expressed and an implied contract is merely in the mode of proof, the elements being the same . . . ." *Broyles v. Brown Eng'g Co.*, 151 So. 2d 767, 770 (Ala. 1963) (citation omitted). In order to prove an implied contract, the plaintiff must allege facts that demonstrate a "mutual agreement." *Id.*

Plaintiffs do not allege any facts or circumstances that demonstrate that the individual defendants, Morgan and Cristos, implicitly agreed to personally pay plaintiffs for trade secrets. In fact, all references to such an agreement for repayment specifically refer to Interstate, to Morgan acting on behalf of Interstate, or to Cristos acting on behalf of Corrpack. (*See* Doc. 10 at 26.)   For example, plaintiffs allege that "Morgan told Plaintiffs *that Interstate* was going to pay the $6M." (Doc. 1-1 ¶ 31 (emphasis added).) Plaintiffs offer no allegations that Morgan or Cristos agreed to compensate them, expressly or impliedly. The "facts and circumstances" cited by plaintiffs only refer to facts and circumstances that could prove an implied contract against Interstate, not Morgan or Cristos. (Doc. 17 at 12-13.) Further, it is not shown in the Complaint that the individual defendants "*personally* impliedly agreed" to compensate the Plaintiffs. (Doc. 10 at 26.)

Because plaintiffs fail to allege any facts from which an implied contract with Morgan and Cristos could be inferred, Count Eleven against those defendants will be dismissed.

### 2.    Contract Claims Against Corrpack

Plaintiffs allege sufficient facts for which an implied contract against Corrpack could be inferred.  "An implied contract arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract."  *Broyles*, 151 So. 2d at 770.

Plaintiffs allege  that Corrpack, through its agent Cristos, "came to plaintiff's facility to observe the coating process."  (Doc. 1-1 ¶ 27.)  There, plaintiffs informed Cristos "that all information to be obtained by [him] from Plaintiffs was confidential, proprietary information to Plaintiffs."  (*Id.*)  Cristos, personally and on behalf of Corrpack, then allegedly agreed "to protect the confidentiality of Plaintiffs' information." (*Id.*)  Next, plaintiffs allege that Corrpack used the information it obtained from plaintiffs, without providing compensation.  (*Id.*)  While Corrpack never expressly promised compensation for use of the confidential information, "a mutual intent to contract" for repayment could be inferred from the facts and the circumstances plead in the Complaint. *Broyles*, 151 So. 2d at 770.

Plaintiffs sufficiently plead a claim of breach of implied contract against Corrpack. Therefore, the Motion to Dismiss Count Eleven against Corrpack will be denied.

### C.    Seventh Cause of Action: Breach of Good Faith and Fair Dealing

#### 1.    Good Faith Claims Against Morgan, Cristos, and Corrpack

Plaintiffs' seventh cause of action states that Interstate "breached its implied duty of good faith and fair dealing" regarding the alleged joint venture agreement between defendant and plaintiff.  (Doc. 1-1 ¶ 63.)  Following these allegations, the unnumbered paragraph at the bottom of this claim prays for judgment against "Defendants, and each of them."  (*Id.* at 25.)  As defendants' Brief points out, "[n]one of the other Defendants are alleged to be parties to the agreement . . . ."  (Doc. 10 at 25.)  Further, plaintiffs' Response does not dispute or even address defendants' argument regarding these allegations.  These claims are thus insufficient to state a claim against defendants Morgan, Cristos, and Corrpack.

For this reason, plaintiffs' seventh cause of action will be dismissed as to defendants Morgan, Cristos, and Corrpack.

#### 2.    Good Faith Claims Against Interstate

Defendants contend that the Complaint fails to state a claim for breach of duty of good faith and fair dealing.  (Doc. 10 at 22-24.)  It is well-settled in Alabama that a cause of action for breach of duty of good faith arising out of a contract must allege specific facts identifying that the contract in question was breached: "The Alabama Supreme Court 'has explicitly held that there is no good faith contractual cause of action'; i.e., 'bad faith is not actionable absent an identifiable breach in the performance of specific terms of the contract.'" *Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1403

(N.D. Ala. 1997) (quoting *Lake Martin/Alabama Power Licensee Ass'n v. Alabama Power Co.*, 601 So. 2d 942, 945 (Ala. 1992)).

The factual allegations in the Complaint are sufficient to state a claim for breach of duty of good faith.  Specifically, it is alleged that as part of a purported joint venture arrangement, Interstate would pay plaintiffs $6 million and evenly split the profits from the sale of recyclable corrugated boxes.  (Doc. 1-1 ¶ 21.)  Later, plaintiffs allegedly shared their confidential and proprietary information with Interstate as part of the agreement, and plaintiffs were reassured that the joint venture agreement existed.  (*Id.* ¶¶ 24, 27-32.)  Finally, it is alleged that sometime in January 2011 Interstate began advertising a recyclable corrugated box, which plaintiffs contend is based on their confidential and proprietary information that was shared with Interstate and later developed at Corrpack's facility in Maryland.  (*Id.* ¶ 36.)  In violation of the joint venture agreement with Interstate, plaintiffs claim they have received no profits from Interstate's sales of these boxes.  (*Id.* ¶ 63.)

Plaintiffs' complaint sufficiently sets forth the terms and subsequent breach of the alleged joint venture between Interstate and plaintiffs.  Defendants' Motion to Dismiss plaintiffs' seventh cause of action for breach of good faith will therefore be denied.

## IV.    Motion to Dismiss Plaintiffs' Claim of Suppression

Defendants' Motion seeks dismissal of plaintiffs' ninth cause of action for suppression.  (Doc. 9 ¶ 9.)  Specifically, defendants argue that the allegations in the Complaint do not satisfy the heightened pleading requirements for fraud under FED. R.

CIV. P. (9)(b).  (Doc. 10 at 27.)  As discussed *supra* in this opinion, the court finds that

plaintiffs' suppression claim is preempted by Section 8-27-6 of the ATSA because it is

based on the same underlying facts as those plead under plaintiffs' ATSA claim.  Thus,

defendants' Motion regarding plaintiffs' failure to state a claim for suppression will be

denied as moot as to their argument that plaintiffs failed to meet the heightened pleading

standard for fraud.

**V.**     **Motion for More Definite Statement**

Pursuant to FED. R. CIV. P. 12(e), defendants move the court to require plaintiffs to

file more definite statements regarding their trade secret and contract claims.  (Doc. 10 at

30-34.)

**A.**     **Misappropriation of Trade Secrets Under the ATSA**

Count four of plaintiffs' Complaint alleges a claim under the ATSA.  (Doc. 1-1 ¶¶

49-52.)  Defendants argue that plaintiffs' trade secrets claim is vague and fails to give

reasonable notice of the relevant facts implicating each defendant.  (Doc. 10 at 30.)  The

court disagrees and finds that plaintiffs have pled sufficient facts to allow defendants to

prepare a reasonable response.  *See* FED. R. CIV. P. 12(e).

Generally, the Complaint describes plaintiffs' overall novel or original idea as

"using a polyester coating to create a recyclable corrugated box . . . to supply coated

paperboard to box manufacturers who would in turn manufacture recyclable corrugated

box[es] for the produce and poultry industries–among other industries."  (Doc. 1-1 ¶ 17.)

The Complaint goes on to specifically list five proprietary and technical aspects alleged to have been misused by defendants:

> (1) the specific temperatures necessary to heat the coating;
> (2) the specific mixtures of materials to produce the coating;
> (3) the ability to mix the coating correctly and to do so consistently;
> (4) the ability to apply the coating to paperboard at the right consistency; and
> (5) the ability to instruct corrugating companies about the proper methods of corrugating and heating the coated paper.

(*Id.* ¶ 19.)  As plaintiffs point out, the primary case cited by defendants to support their argument that the trade secret allegations are vague is factually distinguishable.  (Doc. 17 at 5.)  In *The Mitchell Company, Inc. v. Campus*, a supposed ATSA claim was based on a few vague statements alleging that one defendant "conspired with [two other defendants] . . . to acquire real estate they each knew [plaintiff] . . . would purchase based *on* . . . inside knowledge of company trade secrets and strategic information."  2008 WL 183344, at *7 (S.D. Ala. Jan. 16, 2008).  The District Court held that the plaintiffs' ATSA claim "lack[ed] sufficient factual support" and granted leave to amend and include "the specific trade secrets that were allegedly misappropriated."  *Id.*  Plaintiffs' Complaint, by contrast, contains factual statements of specific proprietary information and processes that allegedly were unique to plaintiffs.  (Doc. 1-1 ¶ 19.)  Further, contrary to defendants' arguments, the Complaint sufficiently alleges each defendant's participation in the events constituting misappropriation.  Throughout the Complaint, each defendant is specifically

alleged to have some involvement in the activities plaintiffs contend gave rise to the misappropriation.  (*Id.* ¶¶ 21-36.)

Plaintiffs have plead sufficient facts to raise a reasonable expectation that discovery will reveal evidence to support their claims.  *See Twombly*, 127 S. Ct. at 1965. Thus, defendants' Motion For A More Definite Statement regarding the ATSA claim will be denied.

### B.     Breach of Express and Implied Contract

Plaintiffs' sixth and eleventh causes of action plead claims for breach of express and implied contract, respectively.  (Doc. 1-1 ¶¶ 58-59, 79-81.)  It is well-settled in Alabama that "[t]he elements of a valid contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Shaffer v. Regions Fin. Corp.*,  29 So. 3d 872, 880 (Ala. 2009) (internal quotation marks and citations omitted).

The court finds that the Complaint pleads sufficient facts regarding plaintiffs' contract claims such that defendants can "reasonably prepare a response."  FED. R. CIV. P. 12(e).  As discussed in the preceding section of this Opinion, Interstate is alleged to have "approached Plaintiffs with a proposal for a joint venture agreement" under which Interstate offered to pay plaintiffs $6 million and evenly split the profits from the sale of recyclable corrugated boxes.  (Doc. 1-1 ¶ 21.)  Morgan, acting as Interstate's representative met with plaintiffs in October, 2007 presumably to discuss the proposed agreement.  (*Id.*)  Later, plaintiffs allegedly shared their confidential and proprietary

information with Interstate as part of the agreement, and plaintiffs were reassured that the joint venture agreement existed.  (*Id.* ¶¶ 24, 27-32.)  Finally, it is alleged that sometime in January 2011, Interstate began advertising a recyclable corrugated box, which plaintiffs contend is based on their confidential and proprietary information that was shared with Interstate and later developed by Corrpack at its facility in Maryland.  (*Id.* ¶ 36.)

There are sufficient factual allegations in the complaint such that defendants can reasonably respond to plaintiffs' contract claims.  Defendants' Motion for a more definite statement of said claims will thus be denied.[7]

## **TRANSFER OF VENUE**

The defendants also seek transfer of this case to the United States District Court for the District of Maryland. (Doc. 11.)[8]  For the following reasons, the Motion will be granted and the case transferred in accord with the court's Order entered contemporaneously with this Opinion.

---

[7]As noted above, defendants' Motion to Dismiss plaintiffs' sixth cause of action for breach of express contract is due to be granted as to the claims against defendants Morgan, Cristos and Corrpack.  Defendants' Motion to Dismiss plaintiffs' eleventh cause of action for breach of an implied contract is due to be granted as to defendants Morgan and Cristos.

[8]Defendants' Motion also sought to sever plaintiffs' claims against former defendants American Inks and Coatings, Inc., Progressive Coatings, Inc., Mosley Holdings, Inc., and Jerry L. Mosley (collectively the "Mosley defendants").  (Doc. 11 at 2; doc. 12 at 22-24.)  Subsequent to defendants filing their Motion, the plaintiffs voluntarily dismissed without prejudice the Mosley defendants.  (Doc. 15.)  Plaintiffs also acknowledged the dismissal in their Response to the Motion to Transfer and did not contest defendants' Motion concerning severance of the Mosley defendants.  (Doc. 18 at 2 nn.1, 3.)  Therefore defendants' Motion for Severance will be denied as moot.

## LEGAL STANDARD: TRANSFER OF VENUE–28 U.S.C. § 1404(a)

Venue is governed generally by 28 U.S.C. § 1391, and "whether resting on diversity or federal-question jurisdiction, venue is proper in the judicial district 'in which a substantial part of the events or omissions giving rise to the claim occurred.'" *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2798 (2011) (quoting 28 U.S.C. § 1391(a)-(b)).  Pursuant to 28 U.S.C. § 1404(a), venue may be transferred by the district court "[f]or the convenience of the parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought."  "The decision to transfer a case to another district is left to the sound discretion of the trial court." *Brown v. Conn. Gen. Life Ins. Co.*, 934 F.2d 1193, 1197 (11th Cir. 1991) (citation omitted). However, "the burden [is] on the defendant to demonstrate why the forum should be changed." *Johnston v. Foster-Wheeler Constructors, Inc.*, 158 F.R.D. 496, 503 (M.D. Ala. 1994) (citations omitted).  While the purpose of the transfer statute is convenience afforded the parties and witnesses, the district court's power to transfer is "expressly limited . . . to those federal districts in which the action 'might have been brought.'" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting 28 U.S.C. § 1404(a)).  Thus, the court's analysis is a "two-part inquiry:" first, to determine if the case could have been brought initially in the transferee court, and second, whether the factors of convenience and interests of justice under Section 1404 favor changing venue to the transferee court. *See A.J. Taft Coal Co., v. Barnhart*, 291 F. Supp. 2d 1290, 1307 (N.D. Ala. 2003) (citations omitted).

**DISCUSSION**

I.    **Whether the Case "Might Have Been Brought" in the District of Maryland**

The first prong of the court's analysis is to determine under Section 1404(a) if this case could have originally been brought in the District of Maryland where defendants propose to transfer venue.  Thus, the court must not only verify that venue would have been proper in the District of Maryland, but also, whether jurisdiction exists in that court.

A.    **Jurisdiction**

The District Court for the District of Maryland would have original subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332(a) based on the diversity of citizenship between the parties and the amount in controversy in excess of $75,000.  Both of the plaintiffs in this action are Alabama corporations with their principal places of business in Jefferson County, Alabama.  (Doc. 1-1 ¶¶ 1-2.)  Defendant Interstate is a Delaware corporation with its principal place of business in Arlington, Virginia.  (Doc. 1 ¶ 8.)  Defendant Corrpack is a Delaware limited liability company with its principal place of business in Cambridge, Maryland.  (*Id.* ¶ 9.)  Defendant Morgan is a citizen of South Carolina.  (*Id.* ¶ 10.)  Defendant Cristos is a citizen of North Carolina.  (*Id.* ¶ 11.)  Finally, the amount in controversy, as plead in the complaint, exceeds $75,000.  (Doc. 1-1 ¶¶ 21 , 31, 66, 71.)

Personal jurisdiction would also exist in the District of Maryland.  Corrpack's principal place of business is in Cambridge, Maryland.  (*Id.* ¶ 5.)  Interstate owns Corrpack through one of Interstate's wholly owned subsidiaries.  (Doc. 12 at 22 n.7.)

32

Morgan is President and COO of Corrpack and maintains an office in Cambridge, Maryland.  (Doc. 12 at 22 n.7; doc. 21-1 at 2.)  Cristos has conducted business at Corrpack's offices in Maryland and traveled there "extensively" during the time relevant to the activities giving rise to plaintiffs' allegations.  (Doc. 12 at 22 n.7.)

**B.    Venue**

Venue in the District of Maryland would have been proper if the case had initially been brought there.  In diversity cases, venue is appropriate in any district where "a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  There are sufficient factual allegations in the complaint illustrating that "a substantial part of the events" forming the basis of plaintiffs' claims occurred in the District of Maryland.  *Id.*  The foundation of plaintiffs' claims is defendants' alleged "wrongful use and/or disclosure of the novel ideas, trade secrets and/or other confidential information" belonging to plaintiffs.  (Doc. 1-1 ¶ 3.)  However, there is no single event pled in the factual history of the case, which definitively states when and where such misuse of plaintiffs' confidential information occurred.  Thus, the court looks to the allegations as a whole to infer whether venue might have been proper in the District of Maryland.

This case could have been brought in the District of Maryland.  It is undisputed that Corrpack's principal place of business is in Cambridge, Maryland.  (*Id.* ¶ 5.)  While this fact, standing alone, does not supply the evidence necessary to determine where venue might have been proper, plaintiff alleges a number of events occurred at

Corrpack's headquarters that are central to the claims at issue.  Plaintiffs traveled to Maryland in March and May 2008 to conduct trials at Corrpack's facilities utilizing plaintiffs' proprietary methods for coating corrugated boxes.  (*Id.* ¶ 30.)  Importantly, it is alleged that during those trials at Corrpack, plaintiffs instructed defendants on the proper corrugating technique to achieve the desired results.  (*Id.*)  Almost a year later, in March 2009, it is alleged that Defendant Morgan told plaintiffs that Interstate succeeded in replicating plaintiffs' proprietary method of coating boxes: "Morgan said that Interstate was now able to successfully perform Plaintiffs' coating on corrugated boxes . . . ." (*Id.* ¶ 33.)  Plaintiffs further allege that as a result of these trials, Interstate and Corrpack began to advertise a box utilizing plaintiffs' proprietary and confidential methods.  (*Id.* ¶ 36.)  It is plaintiffs' contention that the boxes advertised resulted from defendants' use, over a period of time, of plaintiffs' protected information at Corrpack's facility in Maryland: "Not surprisingly, the trials using Plaintiffs' novel idea, trade secret and/or confidential information were employed by Defendants at Mountaire Farms and Interstate Container Cambridge." (*Id.*)  Affidavits submitted by defendants confirm these trials at Corrpack, which plaintiffs claim gave rise to misappropriation of its confidential information:

> Corrpack conducted several trials of Madison Oslin's coating technology in an effort to determine whether various combinations of Madison Oslin's coater, linerboard papers and coatings could adequately replace wax coated linerboard . . . Two paper coating trials were held in Birmingham, but many more meetings and trials were conducted at Corrpack's Cambridge, Maryland headquarters . . . . The trials at Corrpack's headquarters in Maryland and at Mountaire Farms were more extensive than the trials in Birmingham because Madison

34

> Oslin's coating machine does not have the capability of performing essential steps in the process of producing the type box Corrpack wanted. Corrpack's Maryland plant has a corrugator and other machines that were essential and used in the trials.

(Doc. 11-1 ¶ 9.)

Plaintiffs' Response to the Motion to Transfer does not dispute that defendants conducted tests in Maryland involving their proprietary information; however, plaintiffs argue that the key events giving rise to their claims are (1) the initial meeting between the parties in Birmingham, Alabama, which led to an alleged joint venture agreement between them, and (2) a meeting and test production run at plaintiffs' facilities where some of the defendants were given confidential information.  (Doc. 18 at 7-9.)  As defendants point out, however, the joint venture agreement referred to by the plaintiffs was incomplete and a draft at best.  (Doc. 21 at 2-3; *see* doc. 21-1 at 5-12.)  More importantly, defendants make a more compelling argument that the event or omission that gave rise to the claims was not "[t]he alleged agreement to *conduct* a joint venture . . . [but the] actions allegedly taken by Defendants in *contravention* of that purported agreement . . . ."  (Doc. 21 at 3 (emphasis added).)  Further, the evidentiary testimony cited by plaintiffs in support of their Response does not indicate that the joint venture agreement or the test run in Birmingham constituted a substantial part of their claims: "[Plaintiffs] contend that the confidential information obtained by Interstate Resources, Interstate Corrpack and Mr. Cristos at this meeting and production run in Jefferson County, Alabama constitutes a *portion* of the basis for their claims in this lawsuit . . . ."

(Doc. 18-1 ¶ 7 (emphasis added).)  Lastly, the court does not agree with plaintiffs'

contention that their confidential information was "stolen" at the March 7, 2008 meeting

and test run at plaintiffs' facility.  (Doc. 18 at 9.)  As alleged in the Complaint, the

proprietary information at issue was "share[d]" subject to a confidentiality agreement

signed by the defendants present at the meeting.  (Doc. 1-1 ¶ 27.)  The court agrees with

defendants that "any alleged 'theft' or misuse" of the confidential information most likely

occurred at Corrpack's facility in Maryland where it is "alleged to have proceeded with

using the disclosed information without Plaintiffs' permission."  (Doc. 21 at 4; *see* doc. 1-

1 ¶¶ 30, 33, 36.)

The court is satisfied that defendants have met their burden under the first prong of

Section 1404 to show that this case might have been brought initially in the District of

Maryland.

## II.     <u>Convenience of the Parties and Witnesses and the Interests of Justice</u>

The second prong of the court's analysis is whether transfer of venue promotes, on

the whole, greater convenience and advances the interests of justice.  28 U.S.C. §

1404(a).  "The analysis under § 1404(a) requires a balancing of practical considerations,

which centers on convenience of the parties and witnesses, with the interest of justice,

which focuses on fairness and efficiency."  *Barnhart*,  291 F. Supp. 2d at 1309. The

Eleventh Circuit has noted nine factors considered on a motion to transfer venue:

> (1) the convenience of the witnesses; (2) the location of relevant
> documents and the relative ease of access to sources of proof;
> (3) the convenience of the parties; (4) the locus of operative

facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005) (citation omitted).

### A.    Plaintiffs' Choice of Forum

The court first addresses what weight should be given to the plaintiffs' decision to bring this suit in Jefferson County, Alabama. Eleventh Circuit precedent holds that the plaintiff's choice of forum is "accorded . . . considerable deference," *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989) (citation omitted), and "'should not be disturbed unless it is clearly outweighed by other considerations.'" *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (quoting *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. Unit B July 1981)). Accordingly, the chosen forum is not absolutely controlling on the court's analysis, but the movant seeking transfer must set forth sufficient evidence to overcome the deference afforded plaintiffs' choice.

It is not difficult to see why plaintiffs chose to sue in Jefferson County, Alabama. Plaintiffs are Alabama corporations with their principal place of business in Jefferson County, Alabama. (Doc. 1-1 ¶ 1.) All of plaintiffs' principals reside in Jefferson County, Alabama. (Doc. 18-1 ¶ 3.) Plaintiffs developed the confidential processes and information at issue at their facility in the same county. (*Id.* ¶ 4.) Plaintiffs' facility in Jefferson County houses a coating machine, which is currently not in use, but was

apparently operated in March, 2008 as part of a demonstrative "production run," which some of the defendants were allowed to observe.  (*Id.* ¶ 7.)  It is alleged that plaintiffs' claims arose in Jefferson County, Alabama, (doc. 1-1 ¶ 16), and that the meeting and production run at their facility was a basis for at least "a portion" of those claims.  (Doc. 18-1 ¶ 7.)

Defendants, however, point to other occurrences in Maryland that the court finds equally relevant in its venue analysis.  As already discussed *supra* in this opinion, plaintiffs traveled to Maryland in March and May, 2008 to conduct trials at defendant Corrpack's facilities.  (Doc. 1-1 ¶ 30.)   At these trials, defendants were instructed on the proper methods to utilize plaintiffs' proprietary methods for coating corrugated boxes. (*Id.*)  The allegations in the complaint imply that these meetings and trials in Maryland also gave rise to plaintiffs' claims.  (*See id.* ¶ 36.)  In light of these competing factual allegations, deference for the initial forum based on plaintiffs' claimed harm in Alabama is lessened.  *Cf. Thermal Techs., Inc. v. Dade Serv. Corp.*, 282 F. Supp. 2d 1373, 1376 (S.D. Fla. 2003) ("the greater the Plaintiffs' or this lawsuit's connection to the forum they have chosen, . . . the more deference the choice will receive.")

**B.      The Locus of Operative Facts**

The court next addresses where the operative facts giving rise to the claims are centered.  Allegations in the Complaint and evidentiary affidavits along with the arguments contained in the briefs show that, arguably, occurrences in both Alabama and Maryland gave rise to the instant litigation.

38

As already discussed *supra* in this opinion, some of the defendants and their associates first traveled to Alabama in October, 2007 to meet with plaintiffs and to inspect their coating machine housed in plaintiffs' warehouse in Jefferson County.  (Doc. 1-1 ¶ 21; doc. 11-1 ¶ 8.)  It is alleged, that during this time, the parties discussed a joint venture agreement between them.  (Doc. 1-1 ¶ 21; doc. 18 at 3.)  Defendants dispute the validity and completeness of the agreement, (doc. 21 at 3), but plaintiffs argue it "serves as the basis" for their breach of express contract claim.  (Doc. 18 at 4.)

Later, in March, 2008 some of the defendants again traveled to Alabama to observe a test run of plaintiffs' coating machine.  (Doc. 1-1 ¶ 27.)  At this meeting, the defendants in attendance were allegedly made privy to plaintiffs' proprietary information subject to a confidentiality agreement signed by defendants' representatives.  (*Id.* ¶¶ 27-29.)  Plaintiffs contend that this meeting in Jefferson County serves as at least a partial basis for their trade secret claims.  (Doc. 18 at 5.)  However, plaintiffs do not dispute that on multiple occasions in March and May of 2008 some of their principals traveled to Corrpack in Maryland to perform other tests using defendants' facility and boxes.  (Doc. 1-1 ¶ 30; doc. 12 at 11-12.)  Further, plaintiffs allege that during these trials in Maryland, plaintiffs' representatives gave defendants "directions" on the proper corrugating technique necessary to achieve the desired results.  (Doc. 1-1 ¶ 30.)  It is plaintiffs' contention that a few years later, defendants began advertising recyclable corrugated boxes developed with plaintiffs' confidential information "employed"during the Maryland trials and another set of tests in Delaware.  (*Id.* ¶ 36.)  Such allegations imply

that defendants' actual misuse of plaintiffs' confidential information occurred in Maryland where defendants allegedly developed the products and techniques claimed to belong to plaintiffs.

The court thus finds that the locus of operative facts is arguably shared between Alabama and Maryland and that this factor grants equal weight to both sides in the court's venue analysis.

### C.      The Location of Relevant Documents and Relative Ease of Access to Sources of Proof

The court now examines in which forum the relevant documents and other sources of proof are located.   First, the court notes the discussion *supra* of the relevant events that occurred in Alabama and in Maryland.  However, defendants argue that the "majority" of documents and other physical evidence "related to the events alleged in the Complaint are in Maryland." (Doc. 12 at 37.)  Specifically, the "machinery that Corrpack currently uses to produce its wax-alternative corrugated boxes is housed . . . and is operated in Cambridge [, Maryland]" along with documents relating to the development and marketing of this technology.  (*Id.*)  Plaintiffs counter that the ability to produce and transfer electronically stored information negates defendants' arguments regarding the location of documents.  (Doc. 18 at 12 [citing *Island City Lofts, LLC v. United States*, 2009 WL 3418149, at *3 (S.D. Fla. Oct. 16, 2009)].)  While this may be true, the law plaintiffs cite to support this point does not actually hold that such documents carry "little

significance." (Doc. 18 at 12.)[9]  Although the documents at issue in this case may be stored electronically or converted to electronic format, plaintiffs do not dispute that the "majority" of documents are actually located in Maryland.  (Doc. 12 at 37.)  Further, plaintiffs' rebuttal citing the ease of transferring electronic documents negates their own contention that significant documentary evidence is located in Alabama and could just as easily be transported to Maryland via electronic means.

Defendants also argue that the machinery housed at Corrpack's facility in Maryland comprises the greater weight of physical evidence because it currently helps produce the boxes that plaintiffs claim wrongfully adopts their confidential information. (*Id.* at 37-38.)  Plaintiffs counter that their coating machine in Jefferson County, Alabama is the focal point of the allegations in this case.  (Doc. 18 at 12.)  Indeed, some of the defendants traveled to Alabama in 2007 to begin business negotiations with plaintiffs and look at their coating machine, (doc. 11-1 ¶ 8), and the Complaint alleges that Cristos, acting on behalf of defendants, visited plaintiffs' facility in 2008 to "observe the coating process." (Doc. 1-1 at ¶ 27.)  However, these visits, according to plaintiffs, constitute merely a "portion" of their claims.  (Doc. 18-1 ¶ 7.)  Further, defendants argue compellingly that the crux of the claims against them turn on "whether Defendants are using any of Plaintiffs' allegedly confidential information or trade secrets" at the Corrpack facility in Maryland.  (Doc. 21 at 10.)  The court agrees, and finds that the

---

[9] Rather, that proposition was merely argued by the plaintiff non-movant in that case, and while the location of evidence was found to weigh in plaintiff's favor, the finding was based on other grounds. *Island City Lofts*, 2009 WL 3418149, at *3.

Corrpack facility and the machinery housed there carries greater weight and significance in determining venue than plaintiffs' machine in Alabama.

The court thus finds that the location and relative ease of access to sources of proof tips in favor of transfer.

### D.     The Relative Means of the Parties

Although not initially addressed by defendants, plaintiffs ask the court to consider "'the relevant bargaining power and financial positions of the parties.'" (Doc. 18 at 14 [quoting *Moghaddam v. Dunkin Donuts, Inc.*, 2002 WL 1940724, at *4 (S.D. Fla. Aug., 13, 2002)].)  Plaintiffs claim that they will be unduly burdened and financially prejudiced if this case is transferred.  (*Id.* at 14-15 [citing doc. 18-1 ¶ 8].)  However, plaintiffs' Response brief and the evidentiary declaration cited in support of this contention fail to inform the court exactly how transfer prejudices their financial means.  *See Orb Factory, Ltd. v. Design Science Toys, Ltd.*,  6 F. Supp. 2d 203, 210 (S.D.N.Y.1998) ("where proof of . . . disparity is not adequately provided, or does not exist, this is not a significant factor to be considered.").  Further, defendants' larger size and number of employees relative to plaintiffs does not *per se* foreclose their opportunity to seek transfer.

The court finds that this factor does not favor either party.

### E.     Convenience of the Witnesses and Availability of Process to Compel the Attendance of Unwilling Witnesses

Next, the court addresses the overall convenience of the witnesses likely to testify in this case and to what extent this or the transferee court may compel the attendance of

any unwilling witnesses.  The court begins its analysis by noting that "[i]t is often said that 'the most important factor in passing on a motion to transfer under § 1404(a) is the convenience of the witnesses.'" *Harper v. Am. Airlines, Inc*., No. CV-08-S-2410-NE, 2009 WL 1605800, at *5 (N.D. Ala. May 18, 2009) (quoting *Hutchens v. Bill Heard Chevrolet Co.*, 928 F. Supp. 1089, 1091 (M.D. Ala. 1996)).  The court also considers whether non-party witnesses likely to testify are subject to the court's subpoena power if necessary.

The parties vigorously argue why each forum is the better choice concerning the witnesses with knowledge of the relevant facts.  While they are all non-parties in this action, Plaintiffs share five principal owners who all live in Jefferson County, Alabama. (Doc. 18-1 ¶ 3.)  Four of Plaintiffs' principals are likely key witnesses in this case.  (Doc. 12 at 36; doc. 18 at 12.)  Plaintiffs have no other employees and have not indicated any other potential witnesses.

Defendants' Brief lists a total of twenty-nine likely witnesses.  (Doc. 12 at 32-36.) Out of the these, two are named defendants, Morgan and Cristos.  (*Id.* at 35.)  Neither Morgan nor Cristos live in Maryland, the proposed transferee venue.  (*Id.*)  Additionally, six more of the potential witnesses are current employees of defendants but all live outside Maryland and beyond that District's subpoena power.  (*Id.* at 35-36.)  Thirteen potential witnesses currently work at Corrpack and live in Maryland.  (*Id.* at 33-35.)  Five more of defendants' potential witnesses live in Maryland and are either former Corrpack employees or employed by Mountaire Farms–the site of other tests at issue in this case.

43

(*Id.* at 32.)  Three more of defendants' potential witnesses live outside of Maryland but within that District's subpoena power.  (*Id.* at 33.)

A court in this district has opined that in a transfer analysis, the availability of process of non-party witnesses is "an important consideration [when] all of the non-party witnesses who reside within the [transferee district] . . . will be outside the reach of *this court's* subpoena power, but within the subpoena power of the [transferee district]." *Harper*, 2009 WL 1605800, at *4 (citing FED. R. CIV. P. 45.); *see also Ross v. Buckeye Cellulose Corp.*,  980 F.2d 648, 655 (11th Cir. 1993) ("it was reasonable for the district courts to assume that the overwhelming majority of the witnesses whose testimony might be relevant to the trial of appellants' claims resided in the [transferee district] . . . . Consequently, although it was proper for appellants initially to bring their . . . suits in either [of the transferor districts] . . . we hold that these courts did not abuse their discretion in transferring the suits to the [transferee district] . . . .).  If this case remains in the Northern District of Alabama, and assuming the defendants' witnesses do not come willingly, the only witnesses the court can compel to testify are the named parties and plaintiffs' principals.  However, if the case is transferred to Maryland, there are sixteen identified witnesses who either live in the District or are subject to subpoena there.  Because Corrpack's facility is located in Maryland and the greater number of non-party witnesses reside in Maryland and work for or are former employees of defendants, the availability of process to compel these witnesses tips in favor of the transferee forum.

Finally, convenience of all the potential witnesses leans in favor of transferring this case to Maryland.  While all four of plaintiffs' witnesses reside in Jefferson County, Alabama, many more of the potential witnesses work and reside in Maryland where defendant Corrpack's facility is located.  (Doc. 12 at 31-37.)  "Therefore, the convenience of the majority of witnesses favors transfer of this action" to the District of Maryland. *Insuracorp, Inc. v. Am. Fid. Assurance Co.*, 914 F. Supp. 504, 506 (M.D. Ala. 1996).

### F.    The Forum's Familiarity with the Governing Law

Although not addressed by defendants, plaintiffs point out that transfer of this case to the District of Maryland will necessarily require a district court in Maryland to rule on Alabama state law, specifically the ATSA.  (Doc. 18 at 15.)  In deciding to transfer a case to another forum, this district has found that public interest factors, such as "having localized controversies decided at home, the desire to avoid imposing jury duty upon the people of a community which has no relation to the litigation, and the administrative convenience of having the trial of a diversity case in a forum that is at home with the state law that must govern" are all "preeminent considerations." *Harper*,  2009 WL 1605800, at *5 (internal quotation marks omitted); *but see Ellis v. Whirlpool Corp.*, 2007 WL 4706908, at *1 (N.D. Ala. 2007) ("While public interests—such as court congestion and local interest in having the matter adjudicated at home—the availability and convenience of the witnesses and documents are pivotal factors in deciding a motion to transfer venue.").

It is true that the ATSA is at the center of this case, thus raising the issue of requiring the Maryland court to interpret and apply Alabama law if the case is transferred.[10]  However, this fact is not controlling on the court's analysis.[11]  *See Ellis* 2007 WL 4706908, at *1 (transferring putative class action alleging Alabama common law claims because the location of the primary documents, majority of witnesses, the facility where the alleged defective product was designed, and defendants' headquarters were all located in the transferee district).

Nevertheless because transfer of this case will require a Maryland court to rule on Alabama law, the court finds that this factor tips in favor of plaintiffs' choice of venue.

### G.    Convenience of the Parties and Interests of Justice

Lastly, the court addresses the relative convenience of the parties litigating this case in either Alabama or Maryland.  Transfer is inappropriate where it "merely shift[s] inconvenience from the defendants to the plaintiff."  *Robinson*, 74 F.3d at 260. Defendants bear the burden of persuasion, thus the court first looks to their arguments in favor of transfer.  None of the defendants live, work, own property, or have employees in Alabama.  (Doc. 12 at 30.)  Defendant Morgan is responsible for approximately 100

---

[10] The court notes that transfer to the District of Maryland does not create a choice of law problem: "When a defendant moves successfully for a transfer to a more convenient forum under 28 U.S.C. § 1404(a) . . . the transferee court must apply the same state law that the transferor court would have applied."  *Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 991 (11th Cir. 1982) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964); *Loughan v. Firestone Tire & Rubber Co.*, 624 F.2d 726 (5th Cir. 1980)).

[11] Maryland also has a trade secret statute based on the UTSA.  *See* MD. CODE ANN., §§ 11-1201 *et seq.*  The court notes that Section 1207 of the Maryland Act is nearly identical to Section 7 of the UTSA.

employees of Corrpack in Maryland, and thus he would be inconvenienced by traveling to Alabama.  (*Id.*)  Further, as discussed *supra* in this opinion, the Corrpack facility is where defendants allegedly misused plaintiffs' confidential information, and the majority of the witnesses likely to testify are either former or current Corrpack employees.  Transporting physical and documentary evidence in addition to witnesses from Maryland to Alabama will also inconvenience defendants.  By contrast, plaintiffs consist of five principal owners living in Alabama, and only four of them are potential witnesses in this case.  (Doc. 18-1 ¶¶ 3, 5-8.).  Plaintiffs' facility and machinery, which they claim is at the center of this case, do not appear to be active or producing any goods.  (*Id.* ¶ 4.)

The court finds that the defendants would endure significant inconvenience if forced to litigate this case in Alabama.  Such inconvenience is not merely shifted from defendants to plaintiffs because defendants bear a greater hardship in traveling to Alabama than plaintiffs bear in traveling to Maryland.  Plaintiffs' bald assertions of "undue hardship" without more support do not overcome defendants' arguments and evidence illustrating the greater inconvenience.  (Doc. 18-1 ¶ 8.)

For these reasons, this case will be transferred to the District Court for the District of Maryland in accord with the court's Order entered contemporaneously with this Opinion.

## CONCLUSION

Based on the foregoing discussions of the Motions, the court finds:

Due the preemptive effect of ATSA Section 8-27-6, defendants' Motion to Dismiss will be granted as to plaintiffs' first, third, fifth, eighth, and ninth causes of action because these claims are based on the same facts underlying their ATSA claim.

The defendants' Motion to Dismiss plaintiffs' second, tenth, and twelfth causes of action due to preemption by federal patent law will be denied as moot as those claims were voluntarily dismissed.

The defendants' Motion to Dismiss plaintiffs' tenth cause of action due to plaintiffs' failure to state a claim will be denied as moot as that claim was voluntarily dismissed.

The defendants' Motion to Dismiss plaintiffs' second, fifth, tenth, and twelfth causes of action due to failure to state a claim against the defendants actually alleged to have wrongfully filed patent applications will be denied as moot as the claims were either voluntarily dismissed or they are preempted by the ATSA.

The defendants' Motion to Dismiss plaintiffs' seventh cause of action due to failure to state a claim will be denied because the court finds plaintiffs alleged sufficient facts to state a claim.

The defendants' Motion to Dismiss plaintiffs' sixth and seventh causes of action due to plaintiffs including in those claims parties not alleged to have contracted with defendants will be granted as to defendants Morgan, Cristos, and Corrpack.  The

defendants' Motion to Dismiss plaintiffs' eleventh cause of action based on the same theory will be granted as to defendants Morgan and Cristos, but denied as to defendant Corrpack.

The defendants' Motion to Dismiss plaintiffs' ninth cause of action due to failure to state a claim for suppression will be denied as moot as the court finds that claim is preempted by the ATSA.

The defendants' Motion to Dismiss plaintiffs' second cause of action due to failure to state a claim for fraudulent concealment will be denied as moot because that claim was voluntarily dismissed.

The defendants' Motion for a More Definite Statement regarding plaintiffs' ATSA claim will be denied because the plaintiffs have plead sufficient facts such that defendants can reasonably respond to that claim.

The defendants' Motion for a More Definite Statement regarding plaintiffs' breach of express and implied contract claims will be denied because the plaintiffs have plead sufficient facts such that defendants can reasonably respond to those claims.

The defendants' Motion to Sever certain defendants will be denied as moot as those defendants were voluntarily dismissed.

The defendants' Motion to Transfer Venue will be granted.

**DONE**, this 30th day of September, 2012.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE